829 F.2d 1209
 8 Employee Benefits Ca 2457
 Robert J. LOWEN, Allen C. Scott, Lloyd M. Martin, Francis E.
Kyser, David Boyle, Robert Murphy, James R. Hammer, Edmund
Davis, Franklin K. Riley, Anthony Naccarato, Michael Swayne,
Richard Evans, and Allen Taylor, as Trustees of the MM & P
Ind. Ret. Acct. Plan and/or MM & P Pension Plan, Plaintiffs-Appellees,
v.
TOWER ASSET MANAGEMENT, INC., Tower Capital Corporation,
Tower Securities, Inc., Andrew A. Levy, Samuel
Kovnat, W. Randolph Wheeler, and Walter
Levering, Defendants,
Tower Asset Management, Inc., Tower Capital Corporation,
Tower Securities, Inc., Andrew A. Levy, and W.
Randolph Wheeler, Defendants-Appellants.
The Secretary of the United States Department of Labor, Intervenor.
 Nos. 1259, 1260, Dockets 87-7205, 87-7289.
 United States Court of Appeals,
Second Circuit.
 Argued May 28, 1987.
Decided Sept. 17, 1987.
 
 Seham, Klein & Zelman, New York City, on the brief, for plaintiffs-appellees Murphy, Hammer, Davis, Riley, Naccarto, Swayne, Evans and Taylor.
 Burton M. Epstein, Steinberg & Tugendrajch, New York City, on the brief, for plaintiffs-appellees Lowen, Scott, Martin, Kyser and Boyle.
 Bernice K. Leber, New York City (William A. Alper, Steven Marshall, James Keneally, Summit Rovins & Feldesman, New York City, of counsel), for defendants-appellants.
 Jane M. Kheel, Washington, D.C. (George R. Salem, Solicitor of Labor, Patricia Rodenhausen, Regional Solicitor of Labor, Robert N. Eccles, Associate Solicitor, Plan Benefits Sec. Div., Louis L. Joseph, Counsel for Fiduciary Litigation, Plan Benefits Sec. Div., Lois R. Zuckerman, Atty., Plan Benefits Sec. Div., Office of the Solicitor, U.S. Dept. of Labor, of counsel), for intervenor.
 Bettina B. Plevan, New York City (Myron D. Rumeld, Kevin G. Chapman, Proskauer Rose Goetz & Mendelsohn, New York City, of counsel), for plaintiffs-appellees.
 Before LUMBARD, WINTER and MINER, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 Defendants-appellants Tower Asset Management, Inc. ("Tower Asset"), Tower Capital Corporation ("Tower Capital"), Tower Securities, Inc. ("Tower Securities"), Andrew A. Levy and W. Randolph Wheeler appeal from Judge Broderick's grant of summary judgment in favor of plaintiffs-appellees, the Trustees of the International Organization of Masters, Mates & Pilots' Pension Plan ("Pension Plan") and Individual Retirement Account Plan ("IRAP") (collectively, the "Plans"), 653 F.Supp. 1542. Judge Broderick held that the corporations and their three shareholders[1] violated the prohibited transaction provisions of the Employee Retirement Income Security Act of 1974, 29 U.S.C. Secs. 1001-1461 (1982) ("ERISA"), by causing the investment of approximately $30 million of the Plans' assets in companies in which one or more defendants owned an interest and/or from which one or more defendants received fees or other consideration. The investments caused the Plans to lose more than $20 million. Defendants concede that the transactions occurred, and there are in our view no material facts in dispute. We therefore hold that: (1) the investment of the Plans' assets in companies in which one or more defendants owned an equity interest and/or from which one or more received compensation in connection with the investments violated Section 406 of ERISA; (2) Tower Asset is liable as a fiduciary under ERISA because of its position as investment manager for the Plans; and (3) Tower Capital, Tower Securities and the firms' shareholders are jointly and severally liable with Tower Asset. Accordingly, we affirm the grant of summary judgment.
 
 BACKGROUND
 
 2
 Samuel Kovnat, Andrew Levy and W. Randolph Wheeler owned 50%, 25% and 25%, respectively, of the defendant corporations and directly controlled corporate activities as the firms' directors and officers. Tower Asset was an investment manager to the Plans, Tower Capital was an investment banking corporation, and Tower Securities was a registered broker-dealer.
 
 
 3
 In early 1983, the Trustees of the Masters, Mates & Pilots' IRAP selected Tower Asset as the investment manager for $15 million of IRAP assets. The IRAP is an individual account or defined contribution plan within the meaning of Section 3(34) of ERISA, 29 U.S.C. Sec. 1002(34). Pursuant to the Discretionary Investment Management Agreement between the Trustees and Tower Asset, the Trustees appointed Tower Asset as "Investment Manager to provide continuous investment advice for the Trust and to have full discretion and authority to manage, invest and reinvest the Investment Account Assets ... as fully as the Trustees themselves could do." Tower Asset's fee was equal to one-half of one percent of the market value of the IRAP assets under its management. Prior to the signing of this agreement, the IRAP entrusted an additional $10 million of its assets to Tower Asset's management. In November 1984, $6.5 million of Pension Plan assets was entrusted to Tower Asset for management pursuant to a similar "Discretionary Investment Management Agreement." The Pension Plan is a defined benefit plan within the meaning of Section 3(35) of ERISA, 29 U.S.C. Sec. 1002(35).
 
 
 4
 Tower Asset managed the approximately $30 million of IRAP and Pension Plan assets until November 1985. During that time, it invested the two Plans' assets in risky ventures, most of which involved companies in the maritime industry. Many of these companies had no capital and were burdened by debt far in excess of their assets. Some have since ceased operations.
 
 
 5
 One or more of the individual and corporate defendants owned substantial equity interests in some of the companies in which Tower Asset invested the Plans' assets. These transactions are summarized in Appendix A. Many of the companies in which Tower Asset invested the Plans' assets had agreed to pay Tower Capital or Tower Securities commissions, fees and securities in return for investment banking services, including the raising of capital. In most cases, these agreements were executed at or immediately prior to the time that Tower Asset made the particular investments on behalf of the Plans. Also in most cases, the Plans' investments constituted the bulk or all of the capital raised by Tower Capital or Tower Securities. These transactions are summarized in Appendix B.
 
 
 6
 In early 1986, the value of the Plans' assets managed by Tower Asset was estimated at only $9.5 million, having declined from approximately $30 million in November 1984. Plaintiffs began the present action under ERISA Section 502(e)(1), 29 U.S.C. Sec. 1132(e)(1), in December 1985, shortly after the dismissal of Tower Asset as investment manager. In April 1986, plaintiffs moved for summary judgment on those of its claims that alleged prohibited transactions.
 
 
 7
 Provided with extensive documentation of the transactions described supra, Judge Broderick held that the investments in question violated ERISA Section 406(b)(1), which prohibits a fiduciary from "deal[ing] with the assets of the Plan in his own interest or for his own account," 29 U.S.C. Sec. 1106(b)(1), and ERISA Section 406(b)(3), which prohibits a fiduciary from receiving "any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan," 29 U.S.C. Sec. 1106(b)(3). Because Judge Broderick found that Tower Asset, Tower Capital and Tower Securities were ERISA fiduciaries and that the "close and intimate relationship between the corporate and individual defendants" justified piercing the corporate veil, he held all of the defendants jointly and severally liable.
 
 
 8
 Judge Broderick ruled that the defendants were required both to disgorge all profits and other consideration received in violation of Section 406 and to make good to the Plans the investment losses resulting from the prohibited transactions. A final judgment was entered with respect to the claim for restitution of fees and other compensation. Tower Asset, Tower Capital, Tower Securities, Levy, and Wheeler filed this appeal from that final judgment. The determination of the damages resulting from losses to the Plans was referred to Magistrate Buchwald.
 
 
 9
 Subsequently, the district court granted a motion to intervene by the Secretary of Labor, who urges us to affirm. The Secretary had brought a similar action, naming as defendants Tower Asset, Tower Capital, Tower Securities, the individual owners of the Tower entities, the Trustees of the Plans who selected Tower Asset as investment manager, and the Plans themselves.
 
 DISCUSSION
 
 10
 The principal issues before us are whether the Tower Asset investments described above violated Section 406 of ERISA and, if so, which defendants are liable for those violations.
 
 A. Prohibited Transactions
 
 11
 The threshold question is whether, assuming for the moment all of the corporate and individual defendants to be a single enterprise for purposes of ERISA, the transactions in question were prohibited by that statute. We conclude that they were.
 
 
 12
 ERISA establishes both a duty of loyalty and a duty of care. The Act's legislative history indicates that the "crucible of congressional concern was the misuse and mismanagement of plan assets," particularly self-dealing by plan managers. Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 141 n. 8, 105 S.Ct. 3085, 3090 n. 8, 87 L.Ed.2d 96 (1985) (describing legislative history). At issue in the present case is the duty of loyalty as codified in ERISA Section 406(b), which provides in pertinent part:
 
 
 13
 A fiduciary with respect to a plan shall not--(1) deal with the assets of the plan in his own interest or for his own account, ... or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.
 
 
 14
 29 U.S.C. Sec. 1106(b). This rule both assures protection to plan beneficiaries and provides notice to plan fiduciaries of their obligations. It protects beneficiaries by prohibiting transactions tainted by a conflict of interest and thus highly susceptible to self-dealing. It gives notice to fiduciaries that they must either avoid the transactions described in Section 406(b) or cease serving in their capacity as fiduciaries, no matter how sincerely they may believe that such transactions will benefit the plan. Such protection of beneficiaries and notice to fiduciaries requires that Section 406(b) be broadly construed, see Leigh v. Engle, 727 F.2d 113, 126 (7th Cir.1984), and that liability be imposed even where there is "no taint of scandal, no hint of self-dealing, no trace of bad faith," Cutaiar v. Marshall, 590 F.2d 523, 528 (3d Cir.1979), hardly the circumstances in the present case.
 
 
 15
 With regard to Section 406(b)(1), Tower Asset invested assets of the Plans in companies in which defendants owned a substantial equity interest. For example, such an investment enabled Technical Management, Inc., a company substantially owned and controlled by Kovnat, to acquire the stock of Buckeye Petroleum, Inc., which was then substantially owned and controlled by defendants Levy and Wheeler. Appendix A summarizes all such transactions. (Included therein are investments made after defendants acquired an equity interest in a company as a result of an investment of the Plans' assets.) Defendants offer not even a colorable argument that these investments were permissible under Section 406(b)(1).
 
 
 16
 With regard to Section 406(b)(3), Tower Capital and Tower Securities entered into agreements with companies to raise capital in exchange for commissions, equity interests or other compensation. Tower Asset then invested the Plans' assets in these companies. (As noted above, investments of the Plans' assets subsequent to defendants' acquisition of an equity interest of course violated Section 406(b)(1).) These investments were usually made immediately after the agreements for fees were signed and usually were the sole or primary source of capital raised by Tower Capital or Tower Securities for these companies. The district court granted summary judgment against defendants as to such arrangements with twenty-six companies, on the ground that the nature and circumstances of these agreements demonstrated that the payment of fees was "in connection with" the investment of the Plans' assets in violation of Section 406(b)(3). As set forth in Appendix B, defendants received fees and commissions as well as stock ownership interests from these companies.
 
 
 17
 In the district court, defendants pressed detailed claims that material issues of fact existed over whether the compensation received by Tower Capital and Tower Securities from the twenty-six companies was "in connection with" the investment of plan assets. On appeal, the issue is raised, but only in an exceedingly brief and general fashion. With one exception disposed of in the margin,[2] defendants have not made particularized arguments that specific payments of compensation were not "in connection with" investments of the Plans' funds by Tower Asset. Instead, they have issued us a general invitation to scrutinize for error without the benefit of their own critical analysis the district court's decision concerning the numerous transactions involving twenty-six companies. Although the defendants' lack of particularized argument amounts to a waiver, we have, in view of their exposure to very sizeable damages, examined each transaction and will briefly discuss our conclusion that no error was committed.
 
 
 18
 The "in connection with" requirement of Section 406(b)(3) moderates the strict common law rule that a trustee may not profit (other than from trust administration fees) from transactions involving trust assets. See Restatement (Second) of Trusts Sec. 170(1) (1959) (describing strict common law duty of loyalty); A. Scott, Law of Trusts Sec. 170 (1967) (same). The statutory loosening of this rule appears to have been necessary because pension plans may need to utilize investment advisors whose own interests and operations are so large as to preclude the complete isolation of fiduciary transactions demanded at common law but for whom the potential conflict of interest is so small as not to affect their judgment. To that end, Congress included the "in connection with" language and also authorized the promulgation of regulations defining certain exemptions from Section 406. The applicability of these regulations to the present case is discussed infra in this section. We summarize pertinent portions of the legislative history in the margin.[3]
 
 
 19
 We believe that a fiduciary charged with a violation of Section 406(b)(3) either must prove by a preponderance of the evidence that the transaction in question fell within an exemption, see Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), or must prove by clear or convincing evidence that compensation it received was for services other than a transaction involving the assets of a plan.
 
 
 20
 The burden is on the fiduciary for two reasons. First, although the "in connection with" requirement departs from the strict common law rules regarding trustees, we are nevertheless instructed by ERISA to look to those rules for interpretive guidance. See Donovan v. Bierwirth, 754 F.2d 1049, 1055 (2d Cir.1985); see also H.R.Rep. No. 533, 93d Cong., 2d Sess., reprinted in 1974 U.S. Code Cong. & Admin. News 4639, 4649 ("The fiduciary responsibility section [of ERISA], in essence, codifies and makes applicable to these fiduciaries certain principles developed in the evolution of the law of trusts."). In fact, Congress was apprehensive that exceptions to the common law rules against self-dealing were unduly eroding the underlying principle and included Section 406 as a barrier to such erosion. See S.Rep. No. 127, 93d Cong., 2d Sess., reprinted in 1974 U.S. Code Cong. & Admin. News 4838, 4865. The "in connection with" requirement thus should not be construed in a way that creates a loophole that permits self-dealing and, in particular, "kickbacks" to fiduciaries. See H.R.Conf.Rep. No. 1280, 93d Cong., 2d Sess., reprinted in 1974 U.S. Code Cong. & Admin. News 5038, 5089. Second, because the fiduciary has a virtual monopoly of information concerning the transaction in question, it is in the best position to demonstrate the absence of self-dealing. Placing the burden of proof on the fiduciary is thus justified.
 
 
 21
 We also believe that the relatively stringent "clear and convincing" test should be imposed for two reasons in addition to those justifying a shift in the burden of proof. First, when the fiduciary enters into such transactions, it has the power to arrange them in a way that dispels all ambiguity. Any doubt about a causal connection between compensation to such a fiduciary and an investment of a pension plan's assets should therefore be resolved against the fiduciary. Second, the exemptions contained in Section 408 or in regulations promulgated thereunder ought to be regarded as the usual method by which a fiduciary engages in transactions otherwise prohibited by Section 406. Accordingly, transactions that fall outside these exemptions deserve exacting scrutiny.
 
 
 22
 Applying these principles, we look first to whether the exemptions contained in Section 408 or the regulations are applicable. We conclude that there is no material fact in dispute with regard to the inapplicability of the exemptions, and that summary judgment was properly granted on this issue.
 
 
 23
 Section 408(c)(2) provides that Section 406 shall not be construed to prohibit any fiduciary from "receiving any reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of [the fiduciary's] duties with the plan." 29 U.S.C. Sec. 1108(c)(2). By its express language, this provision permits "compensation from such plan" only for the performance of services "with the plan." It thus exempts the fees paid pursuant to a plan's investment management agreements, but it does not exempt the fees and other compensation that defendants received from companies in which the Plans' assets are invested.[4]
 
 
 24
 Defendants' practices are also not exempt from Section 406(b) under any of the exemptions issued by the Secretary of Labor pursuant to Section 408(a) of the Act.[5] None of the three arguably relevant exemptions is applicable. Class Exemption 75-1, 40 Fed.Reg. 50845 (1975), exempts from Section 406 certain broker-dealer transactions, purchases of publicly offered securities during an underwriting, and transactions with market-makers. However, defendants simply did not perform brokerage transactions for the Plans, purchase securities for the Plans during an underwriting or act as a market-maker for any of the relevant securities.[6] Similarly, defendants have not shown that the requirements of Class Exemption 79-1, 44 Fed.Reg. 5963 (1979) (withdrawn by Class Exemption 86-128, 51 Fed.Reg. 41682 (1986)), which exempted certain brokerage transactions, and Class Exemption 84-14, 49 Fed.Reg. 9494 (1984), which exempts transactions involving investment funds managed by "qualified professional asset managers," are applicable.[7]
 
 
 25
 Because the exemptions do not apply, defendants' submission on the motion for summary judgment had to be sufficient to allow a trier to find by clear and convincing evidence that compensation received by Tower Capital and Tower Securities from companies in which the Plans' assets were invested was not "in connection with" those investments. Under that standard, defendants' response to the evidentiary materials submitted in support of the motion for summary judgment was inadequate. Accordingly, summary judgment was properly granted.
 
 
 26
 In the case of most of the transactions, the decision of the district court is virtually unchallengeable.[8] Usually, the receipt of compensation by Tower Capital or Tower Securities was virtually contemporaneous with the investment of the Plans' funds.[9] See Appendix B. According to the defendants' own submissions in response to the motion for summary judgment, virtually all of the capital raised by Tower Capital or Tower Securities for particular companies was provided by the Plans.
 
 
 27
 In response to the overwhelming evidence of kickbacks, defendants offered largely conclusory statements that fell far short of carrying the heavy burden they face. For example, the Rolfite transaction outlined in Note 9, supra, was explained as follows: "A plain reading of the August 16 agreement reveals that the $25,000 payment was a fee for substantial financial, public relations and government relations services...." The fact that the contract between Tower Securities and Rolfite states that the fee will be paid for future services that may or may not have been performed or that may or may not have been of value does not show by clear and convincing evidence that there was no "connection" with Tower Assets' investment of $200,000 of the Plans' funds in Rolfite on the very same August 16. The claim that Rolfite, much less defendants, viewed these transactions as unrelated events that occurred independently of each other violates common sense as well as common principles of fiduciary obligations. In the case of other transactions, somewhat more extensive explanations are offered, but they too are conclusory and undocumented. At best, defendants' submissions demonstrate ambiguity, and for reasons stated earlier, that ambiguity must be resolved against them. In sum, we have examined each transaction, and that examination has disclosed no error.
 
 B. Tower Asset's Fiduciary Status
 
 28
 We turn now to the question of which defendants are liable for engaging in the prohibited transactions. We address first whether Tower Asset was a fiduciary under ERISA and thus subject to the prohibitions of Section 406(b).
 
 
 29
 The core issue in dispute with regard to Tower Asset arises from the claim, which we assume to be true for purposes of this discussion, that the Plans' Trustees compelled Tower Asset to make many, or all, of the investments prohibited to fiduciaries by Section 406 and that, as to those investments, Tower Asset cannot be regarded as a fiduciary.
 
 
 30
 That Tower Asset held a position as an ERISA fiduciary is simply beyond doubt. ERISA Section 402(c)(3) authorizes a plan's "named fiduciary," here the Plans' Trustees, to appoint an "investment manager" to manage designated assets of a plan. ERISA Section 3(38) defines "investment manager" as
 
 
 31
 any fiduciary--
 
 
 32
 (A) who has the power to manage, acquire, or dispose of any assets of a plan;
 
 
 33
 (B) who is (i) registered as an investment advisor under the Investment Advisors Act of 1940; [or is a bank or insurance company]; and
 
 
 34
 (C) has acknowledged in writing that he is a fiduciary with respect to the plans.
 
 
 35
 29 U.S.C. Sec. 1002(38).
 
 
 36
 Tower Asset's contracts with the Plans were explicitly drafted so as to make Tower Asset an "investment manager" under Section 3(38). With regard to 3(38)(A), both agreements provided that Tower Asset would "have the power and obligation to manage the securities, funds and other property which constitute the Investment Account Assets in its sole and absolute discretion, subject to its fiduciary obligation," "provide investment advice and recommendations," and "have complete discretion in the investment and reinvestment of the Investment Account Assets." With regard to Section 3(38)(B), Tower Asset warranted in both agreements that it would maintain its status as a registered investment advisor under the Investment Act of 1940. With regard to Section 3(38)(C), Tower Asset explicitly acknowledged in both agreements that, "with respect to the Plan, the Trust and Investment Account Assets, it is a 'fiduciary' and 'investment manager' as defined, respectively, in Sections 3(21) and 3(38) of ERISA." Finally, the agreements stated that Tower Asset could not engage in transactions prohibited by Section 406.
 
 
 37
 Tower Asset argues, however, that these agreements were orally modified to deprive it of discretionary authority in many or all transactions. Even if true, this argument is without legal merit. The agreements in question explicitly incorporated numerous ERISA statutory provisions and must be interpreted in light of ERISA's structure and purposes. ERISA was deliberately structured so that legal responsibility for management of ERISA plans would be clearly located. ERISA Section 1102(1) thus directs that every plan designate a "named fiduciary" with power "to control and manage" the plan. Congress included this requirement "so that responsibility for managing and operating the Plan--and liability for mismanagement--are focused with a degree of certainty." Birmingham v. Sogen-Swiss Int'l Corp. Retirement Plan, 718 F.2d 515, 522 (2d Cir.1983). The obligations of named fiduciaries with regard to their duty of care, however, can be reduced by the appointment of an investment manager under ERISA Section 402(c)(3). Under Section 405(d)(1), once such an appointment has been made, the trustees cannot be held liable for any act or omission of that investment manager so far as the assets entrusted to the manager are concerned. The plain intent of this statutory structure is to allow plan trustees to delegate investment authority to a professional advisor who then becomes a fiduciary with a duty of care and duty of loyalty to the plan while the trustees' legal responsibilities regarding the wisdom of investments are correspondingly reduced. Viewed in that context, we believe that an investment manager for an ERISA plan must unequivocally cease to serve in that position and terminate in writing all contracts or arrangements with the plan concerning that position before playing any role in transactions denied to fiduciaries by Section 406. It cannot be a fiduciary every other hour and the recipient of plan assets in the intervals. Cf. Lewis v. Seanor Coal Co., 382 F.2d 437, 442-44 (3d Cir.1967) (written obligation regarding payments to a retirement plan cannot be modified by unwritten understanding under Section 302 of Labor Management Relations Act), cert. denied, 390 U.S. 947, 88 S.Ct. 1035, 19 L.Ed.2d 1137 (1968).
 
 
 38
 Tower Asset's agreements with the Plans explicitly included such a delegation of authority as described above. Moreover, Section 1(b) of these agreements stated that the appointment of Tower Asset would insulate the Trustees from liability for the former's acts or omissions pursuant to Section 405(d)(1), 29 U.S.C. Sec. 1105(d)(1).
 
 
 39
 ERISA contemplates that after management authority over Plan assets is delegated to an investment manager under Section 402(c)(3), the manager becomes a fiduciary to the plan and not merely the instrument by which the investment whims of trustees are carried out with unquestioning obedience. The fiduciary obligations of an investment manager to a plan require it to exercise independent, professional judgment and to insure that the investments of assets entrusted to it are based on such judgments. If the judgment in question is not its own, the investment manager should avoid any connection with that transaction so that it is clear which party bears the duty of care. Under ERISA, an investment manager's fiduciary obligations may not be turned on and off like running water. ERISA's purpose of clearly locating legal obligations will be vitiated if plaintiffs are required to engage in an after-the-fact sorting-out of actions, statements and states of minds among possible fiduciaries to determine which is legally responsible.[10]
 
 
 40
 If the Trustees ordered Tower Asset to make particular investments, Tower Asset, as a discretionary investment manager for the Plans, was under an obligation to the Plans to make a professional and independent judgment as to the wisdom of the proposed investments. If Tower Asset viewed the investments negatively, it should have so informed the Trustees and declined to carry out their instructions, particularly in light of the potential profit for those who controlled Tower Asset. See Part C of this opinion, infra. Even if it viewed the investments favorably, Section 406 forbade Tower Asset from allowing those who controlled it to profit from the transaction. When it executed the transactions, Tower Asset breached its duties to the Plans either by: (1) serving as a cover for the Trustees to make investments without professional advice but from which its associates would profit, or (2) independently selecting investments from which those who controlled Tower Asset would profit. It matters not which version is fact because either entails the precise kind of conflict of interest that the prohibitions of Section 406 were designed to eliminate.
 
 
 41
 Whether the Trustees directed the investments is thus legally irrelevant so far as Tower Asset's liability is concerned. At best, the Trustees would share joint and several liability with Tower Asset. See 29 U.S.C. Sec. 1105(a) (provisions governing co-fiduciary liability).
 
 C. The Liability of the Other Defendants
 
 42
 We believe that Tower Capital, Tower Securities and the individual defendants are jointly and severally liable with Tower Asset because they acted in concert with the latter in causing the prohibited investments.
 
 
 43
 The parties have expended much effort in the district court and on appeal in debating whether Tower Capital, Tower Securities and the individual defendants are fiduciaries of the Plans. We deem this issue to be irrelevant in light of the principle that parties who knowingly participate in fiduciary breaches may be liable under ERISA to the same extent as the fiduciaries. See, e.g., Thornton v. Evans, 692 F.2d 1064, 1077-78 (7th Cir.1982) (reversal of dismissal of action against several defendants charged with defrauding employee benefit plan, notwithstanding lower court's finding that defendants lacked discretionary authority to be deemed ERISA "fiduciaries"); Donovan v. Daugherty, 550 F.Supp. 390, 410-11 (S.D.Ala.1982) (plan's attorney, who was not ERISA fiduciary, found liable for trustee's fiduciary violation because he participated in and was enriched by their decisions).
 
 
 44
 Authority for recovery against non-fiduciaries is derived from trust law principles, upon which ERISA is based, see Freund v. Marshall & Ilsley Bank, 485 F.Supp. 629, 641-42 (W.D.Wis.1979), and on ERISA's remedial provisions, which entitle plaintiffs:
 
 
 45
 (A) to enjoin any act or practice which violates any provision of [Title I of ERISA] or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provision of [Title I] or the terms of the plan.
 
 
 46
 29 U.S.C. Sec. 1132(a)(3). Neither the separate corporate status of the three corporations nor the general principle of limited shareholder liability afford protection where exacting obeisance to the corporate form is inconsistent with ERISA's remedial purposes. Parties may not use shell-game-like maneuvers to shift fiduciary obligations to one legal entity while channeling profits from self-dealing to a separate legal entity under their control.
 
 
 47
 The Supreme Court has "consistently refused to give effect to the corporate form where it is interposed to defeat legislative policies." First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba, 462 U.S. 611, 630, 103 S.Ct. 2591, 2601, 77 L.Ed.2d 46 (1983). In determining whether to disregard the corporate form, we must consider the importance of the use of that form in the federal statutory scheme, see Schenley Distillers Corp. v. United States, 326 U.S. 432, 437, 66 S.Ct. 247, 249, 90 L.Ed. 181 (1946) (per curiam), an inquiry that generally gives less deference to the corporate form than does the strict alter ego doctrine of state law. Capital Tel. Co. v. FCC, 498 F.2d 734, 738-39 (D.C.Cir.1974).
 
 
 48
 Courts have without difficulty disregarded form for substance where ERISA's effectiveness would otherwise be undermined. In Alman v. Danin, 801 F.2d 1 (1st Cir.1986), for example, the incorporators of an inadequately capitalized corporation were held liable for the corporation's unpaid contributions to various pension plans. The First Circuit noted:
 
 
 49
 ERISA, the statute sought to be enforced here, cannot be said to attach great weight to corporate form. Indeed, deferring too readily to the corporate identity may run contrary to the explicit purposes of the Act. Congress enacted ERISA in part because many employees were being deprived of anticipated benefits, which not only reduced the financial resources of individual employees and their dependents but also undermined the stability of industrial relations generally.... Allowing the shareholders of a marginal corporation to invoke the corporate shield in circumstances where it is inequitable for them to do so and thereby avoid financial obligations to employee benefit plans, would seem to be precisely the type of conduct Congress wanted to prevent.
 
 
 50
 801 F.2d at 3-4 (citations omitted).
 
 
 51
 A failure to disregard the corporate form in the circumstances of the present case would fatally undermine ERISA. The record demonstrates beyond dispute extensive intermixing of assets among the corporations, and among the corporations and individual defendants, without observing the appropriate formalities, simultaneous sharing of employees and office space by the corporate and individual defendants, and wholly inadequate capitalization of the corporations in light of the nature of the businesses in which they were engaged. The individual defendants were in no way passive investors in the corporate defendants. They personally and actively controlled and dominated those firms. The individual defendants caused Tower Asset to invest in companies in which they, their close relatives, Tower Capital, or Tower Securities had an equity interest. The individual defendants also arranged that Tower Capital and Tower Securities would be compensated by particular companies for Tower Asset's investing the Plans' assets in those companies. The individual defendants then took these proceeds for themselves in the form of salaries, bonuses and unsubstantiated travel and expense reimbursements, and left the corporate defendants with virtually no net worth.
 
 
 52
 In other much less compelling circumstances, federal courts have found the owners of a corporation liable as a matter of law under federal statutes based solely on the owners' total and exclusive domination of the corporation. See, e.g., First Nat'l City Bank v. Banco Para el Commercio Exterior de Cuba, 462 U.S. at 629, 103 S.Ct. at 2601 ("where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created ... one may be held liable for the actions of the other"); Capital Tel. Co. v. FCC, 498 F.2d at 736-39 (affirming FCC's authority to pierce corporate veil in order to achieve statutory objectives where firm owned by one individual who was also its president). ERISA Section 406(b)'s prohibitions would be empty rhetoric if the corporate form might so easily shield those who profit from prohibited transactions.
 
 
 53
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 CONCLUSION
 
 54
 All defendants are therefore jointly and severally liable for violations of Section 406(b). Judge Broderick held that defendants should disgorge fees of $1,087,787 and other consideration they received in violation of Section 406. We agree.
 
 
 55
 Section 409(a) of ERISA provides, in part, that
 
 
 56
 [a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate.
 
 
 57
 29 U.S.C. Sec. 1109(a). Judge Broderick thus properly entered a final judgment pursuant to Fed.R.Civ.P. 54(b) ordering restitution of those fees in the amount of $1,087,787 as well as the identified equity interests obtained by defendants in connection with the investment of the Plans' assets. Because Judge Broderick's decision directing an award of damages based on losses to the Plans as a result of the violation of Section 406 is not a final judgment, we do not address any issue that ruling may raise that is not implicated by the judgment before us.
 
 
 58
 Judge Broderick's grant of summary judgment in favor of plaintiffs-appellees is affirmed. So far as practicable, this panel will hear any further appeal in this matter.
 
 
 59
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 [1]
 Defendant Samuel Kovnat did not appeal from the district court's decision. Plaintiffs did not seek summary judgment as to defendant Walter Levering, so no judgment has entered as to claims against him
 
 
 [2]
 Defendants have failed to raise a material issue of fact with respect to the fee of $136,000 received by Tower Securities from Combustion Catalyst, a research and development limited partnership affiliated with the Rolfite Company. The agreement between Rolfite and Tower Securities incorporated the Combustion Catalyst fee agreement. Moreover, defendant Kovnat testified that one of the primary services performed by Tower Securities for Rolfite was obtaining financing for Combustion Catalyst. The $136,000 fee thus was clearly received "in connection with" the investment of the Plans' assets, even if no funds of the Plans were invested directly in Combustion Catalyst
 
 
 [3]
 The House Conference Report stated that
 [t]he conferees recognize that some transactions which are prohibited (and for which there are no statutory exemptions) nevertheless should be allowed in order not to disrupt the established business practices of financial institutions which often perform[ ] fiduciary functions in connection with these plans consistent with adequate safeguards to protect employee benefit plans. For example, while brokerage houses generally would be prohibited from providing, either directly or through affiliates, both discretionary investment management and brokerage services to the same plan, the conferees expect that the Secretary of Labor and the Secretary of the Treasury would grant a variance with respect to these services (and other services traditionally rendered by such institutions), provided that they can show that such a variance will be administratively feasible and that the type of transaction for which an exemption is sought is in the interest of and protective of the rights of plan participants and beneficiaries.
 H.R.Conf.Rep. No. 1280, 93d Cong., 2nd Sess., reprinted in 1974 U.S.Code Cong. & Admin.News 4639, 5038, 5089-90. Similarly, the Senate Report noted that
 [t]he Committee is aware that there exist various established and recognized practices which are accepted in commercial banking, trust and insurance companies, investment companies and other advisors in connection with employee benefit plans. However, notwithstanding current acceptance of such practices, the Subcommittee has found it difficult to establish definitive criteria concerning those practices which should be specifically proscribed. This difficulty was weighed by the Committee against the overriding need to protect workers' pension funds, and it concluded that the latter's interest out-weighed any current attempt to define all practices and relationships which constitute not only actual but real potential threats to the security and preservation of the pension funds. Accordingly, the Secretary of Labor[ ] is authorized by the Act to waive any proscribed practice as long as it is consistent with the purposes of the Act and determined to be in the interests of pension plan participants.
 S.Rep. No. 127, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Admin.News 4838, 4868.
 
 
 [4]
 The legislative history of the Act reinforces our conclusion that such payments do not fall within the scope of the exemption. Thus, the Conference Report on ERISA provides that: "[ERISA] specifically allows the plan to pay a fiduciary or other party-in-interest reasonable compensation (or reimbursement of expenses) for services rendered to the plan if the services are reasonable and necessary." H.R.Conf.Rep. No. 1280, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Admin.News 5038, 5092 (emphasis added). This language indicates that the services exempted under ERISA Section 408(c)(2) are services rendered to a plan and paid for by a plan for the performance of plan duties, not services rendered to companies in which a plan invests funds that are paid for by those companies. The Department of Labor's regulations also indicate that the exemption contained in Section 408(c)(2) applies only to services which are provided to a plan and paid for by the plan, as opposed to services provided to outside parties. Thus, 29 C.F.R. Sec. 2550.408c-2(a) provides that:
 [S]ection 408(b)(2) of [ERISA] refers to the payment of reasonable compensation by a plan to a party in interest for services rendered to the plan. Section 408(c)(2) of the Act and Secs. 2550.408c-2(b)(1) through 2550.408c-2(b)(4) clarify what constitutes reasonable compensation for such services.
 Id. (emphasis added).
 
 
 [5]
 This provision provides that the Secretary of Labor "may grant a conditional or unconditional exemption of any fiduciary or transaction, or class of fiduciaries or transactions, from all or part of the restrictions imposed by [Section 406]." 29 U.S.C. Sec. 1108(a)
 
 
 [6]
 Indeed, the record indicates that almost none of the requirements under Class Exemption 75-1 were met. For example, the vast majority of the investments were private placements of debt rather than public offerings. Most of the companies involved were start-up companies, which removed them from the scope of the exemption. The amount invested was above the three percent limit with respect to the percentage of plan assets that is permitted under the exemption. This amount apparently was also more than the three percent of the total financing of the companies permitted under this exemption. There is also no indication that any of the recordkeeping or inspection provisions of the exemption were satisfied. Finally, defendants' role in effecting the investments would make the exemption inapplicable, except for the market-making portion, because of limitations on who the fiduciary making the transaction may be
 
 
 [7]
 With respect to Class Exemption 79-1, the transactions at issue in this case did not involve broker-dealer agency transactions, and there is no claim that any of the reporting requirements were met. With respect to Class Exemption 84-14, there was no pooled investment fund here. The shareholders' equity of the defendants was too small to qualify them as qualified professional asset managers, and the exemption does not cover transactions with the asset manager or any related parties
 
 
 [8]
 In the case of American Heavy Lift, to take the most egregious example, the the contract providing for fees to be paid to Tower Capital as a financial consultant explicitly required the investment of the Plans' funds by Tower Asset
 
 
 [9]
 The following transactions are examples of such practices:
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 [10]
 By letter dated July 23, 1987, defendants also note that the plaintiffs have urged the magistrate to examine each investment transaction individually in order to determine the losses to the Plans. Defendants contend that this position is somehow inconsistent with the view plaintiffs took of the obligations of those who occupy a fiduciary position. Although the issues before the magistrate are not the subject of this appeal, we note that no such inconsistency exists. A legal rule that one in a fiduciary position may not turn his or her obligations on or off at will is in no way inconsistent with a transaction-by-transaction analysis to determine damages