839 F.Supp. 1068 (1993)
In re CONSOLIDATED WELFARE FUND ERISA LITIGATION.
Robert REICH, Secretary of Labor, United States Department of Labor, et al., Plaintiff,
v.
Burton GOLDSTEIN, et al., Defendants.
MDL No. 902, No. 91 Civ. 4031 (MP).
United States District Court, S.D. New York.
December 20, 1993.
*1069 Tess Ferrera, U.S. Dept. of Labor, Office of the Sol., Washington, DC, for plaintiff U.S. Dept. of Labor.
Robert N. Eccles, O'Melveny & Myers, Washington, DC, for defendant Burton Goldstein.

OPINION
MILTON POLLACK, Senior District Judge:
The Department of Labor ("DOL") brings suit against Burton Goldstein, a former trustee of an employee welfare benefit plan (the "Consolidated Local 867 Health and Welfare Fund ("the Fund")). Pursuant to Fed. R.Civ.P. 56, the DOL moved the Court for partial summary judgment on the issue of Goldstein's liability for violating the fiduciary duty provisions of ERISA. The Fund sold health insurance benefits through a network of "employer labor relations consultants," who were in fact nothing more than insurance agents. Plaintiff has established that defendant was a plan fiduciary; that he was also the sole owner of two companies that sold Fund insurance; that he incorporated one such company for the sole purpose of serving the Fund; that he alone set and approved the fees and commissions which his companies retained from payments paid by beneficiaries to the Fund which were simply "monthly contributions to the Fund"; and that he was compensated through these companies. Defendant has failed to demonstrate any genuine issue of material fact which controverts the otherwise inescapable conclusion that defendant's activities were in clear violation of the fiduciary standards of ERISA, and merit partial summary judgment in plaintiff's favor.

I. Background
Consolidated Local Union 867 was founded by William Loeb in July 1988. In October 1988, Local 867, through a Trust Agreement, established the Consolidated Local 867 Health and Welfare Fund ("the Fund"). The Fund purported to be a Taft-Hartley plan offering hospital and major medical coverage to its participants and beneficiaries. The DOL alleges that Local Union 867 was a "front" for selling health insurance. Beneficiaries were recruited to join Local 867 and the Fund by so-called "Employer Labor Relations Consultants," who were in fact nothing more than insurance agents.
Defendant Burton Goldstein started out as one such agent. In 1988, Goldstein did business through a wholly-owned corporation, American Benefits Corporation ("ABC"), which acted as a broker for owners of small businesses and associations of small employers in obtaining coverage for health, medical and other employee benefits. In 1988, ABC entered into the following contractual arrangement with Local 867. ABC, on its own behalf, signed a "collective bargaining agreement" *1070 with Local 867. Pursuant to this collective bargaining agreement, any employers recruited by ABC could enroll their employees as "members" of Local 867, thereby making them eligible for benefit coverage under the Fund. The employers in turn signed socalled "Adoption Agreements" with ABC, pursuant to which their employees were guaranteed health insurance coverage. In essence, ABC functioned as a middleman between the Fund and the employers.
The Trust Agreement which governed the Fund provided that employer contribution rates would be set by reference to the collective bargaining agreements between brokers (such as ABC) and the Union. Employers did not pay the Fund directly. Rather, they paid their premiums to brokers (such as ABC) according to rates which were set in the "Adoption Agreements" between the employers and ABC. The Adoption Agreements invariably included language expressly stating that the contribution rates were "monthly contributions for the Welfare Plan." Upon receiving the employers' premiums, ABC would remit a portion of the money to the Fund. Defendant admits that ABC always retained part of the payment (usually about 15% of the premium) as a "commission" for its services. Defendant also concedes that the Adoption Agreements did not specifically inform the employers that their payments included a broker commission.
In November 1988, one month after the Fund's creation, William Loeb invited Goldstein to serve as trustee of the Fund. Goldstein accepted and continued to serve as trustee through 1991. Throughout this period, he remained sole owner of ABC, and ABC continued to function as a insurance broker for the Fund, retaining a percentage of employer premiums as "commissions." Goldstein alone decided what ABC's "commissions" would be; no other fiduciaries of the Fund were involved in approving ABC's compensation. Plaintiff alleges that from January 1989 to March 1991, Goldstein caused ABC to be paid $139,282 in commissions; Goldstein admits that he caused ABC to be paid commissions, but he disputes the exact amount.
In August 1990, Goldstein founded Business Marketing Consultants ("BMC"), a company which, like ABC, provided brokerage services to the Fund. Goldstein was the sole owner of BMC. BMC catered to all the non New York employers insured through the Fund.[1] BMC billed these employers a monthly charge which, defendant acknowledges, included: (1) the contribution rates remitted to the Fund, (2) a commission paid to the enrolling agent, and (3) an undisclosed $20 per employee monthly charge that BMC retained as compensation for its "administrative services." Like ABC, BMC had entered into a "collective bargaining arrangement" with the Union; this collective bargaining arrangement however made no mention of a commission or an allowance for BMC's services. Again, the DOL alleges that Goldstein alone set this $20 service charge, and that no other fiduciary approved BMC's compensation. Plaintiff DOL alleges that from October 1990 to August 1991, Goldstein caused BMC to be paid $280,532 "from plan assets." Goldstein admits that he caused BMC to be paid, but he disputes the amount and contends that the monies were not "plan assets."

II. Parties' Contentions
Plaintiff DOL seeks partial summary judgment against defendant Goldstein for violations of ERISA's fiduciary duty standards as set forth in Sections 406(b)(1), (b)(2) and (b)(3) of ERISA, 29 U.S.C. § 1106(b)(1), (b)(2), (b)(3).[2] Plaintiff contends that the *1071 essential factual elements needed to show violations of Section 406(b) have been conceded by the defendant. The DOL contends, and Goldstein does not deny, that Goldstein's pleadings and deposition establish: (1) that he was a plan fiduciary; (2) that he was the sole owner of ABC and BMC; (3) that he incorporated BMC for the sole purpose of serving the Fund; (4) that he alone set the fees or commissions that ABC and BMC charged; and (5) that he was compensated through ABC and BMC. Goldstein never challenges these factual claims, but he contends that his admitted conduct did not violate the relevant sections of ERISA.
ERISA Section 406(b) states as follows:
A fiduciary with respect to a plan shall not
(1) deal with the assets of the plan in his own interest or for his own account,
(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interests of its participants or beneficiaries, or
(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.
29 U.S.C. § 1106(b). The DOL contends that Goldstein violated (b)(1) by creating and profiting from BMC, whose income derived from "the assets of the plan." The DOL contends that Goldstein violated (b)(2) because Goldstein's interest, as sole owner of ABC and BMC, was to charge the Plan the highest possible amount, while the Plan's interest was to seek the best possible service at the best price: Goldstein's interests are thus inherently adverse to the Plan's. Finally, the DOL contends that Goldstein violated (b)(3) when he received compensation from ABC and BMC, during the time ABC and BMC were engaged in transactions with the Plan involving Plan assets. The DOL contends, Goldstein is statutorily liable for the disgorgement of profits, for all losses to the plan, and for such other relief as the court may deem appropriate.
Defendant Goldstein responds summary judgment is improper because there is no evidence that he (or ABC or BMC) received any compensation from the Fund. Rather, Goldstein contends, ABC and BMC were compensated solely by the employers.
Goldstein contends that he is not liable under Section 406(b)(1) when he determined what commissions and fees ABC and BMC would earn, because he (i) was not acting as a plan fiduciary; and (ii) was not dealing with "plan assets." Goldstein argues that he was not acting as a plan fiduciary when he determined what commissions and fees ABC and BMC would earn; rather, he was acting in the capacity of an officer of those companies. Goldstein acknowledges that he was a fiduciary of the Fund, but argues that fiduciary status under ERISA is not "an all-or-nothing concept" and contends that a person can be a fiduciary as to one activity and a non-fiduciary as to other activities performed with respect to the same plan.
Goldstein also contends that monies received by ABC and BMC from the employers were not "assets of the plan." The term "assets of the plan" is not defined in ERISA. Goldstein asserts that in the absence of a statutory definition, the term should be defined by reference to the Trust Agreement with established the Fund. Section 5.1 of the Trust Agreement provides:

*1072 ... [e]ach participating employer shall pay to the Trustees the required contribution for each eligible employee in accordance with the terms of the collective bargaining agreement between the Union and the contributing employers ...
Goldstein alleges that the "collective bargaining agreement" referred to in the quoted language is the agreement between the Union and ABC/BMC, not the Adoption Agreement between ABC/BMC and the employers. Goldstein thus contends that "the assets of the plan" included only the amounts that ABC and BMC were contractually obligated to remit to the Fund as specified in the "collective bargaining agreements" between ABC/BMC and the Union. Consequently, Goldstein asserts, the amounts paid to ABC and BMC by the employersi.e., the amounts from which ABC and BMC took commissionswere not "assets of the plan."
Goldstein also disputes his liability under Sections 406(b)(2) or (b)(3). He contends that (b)(2) "prohibits a fiduciary from representing in the same transaction both a plan and a party adverse to the plan" and that under controlling precedent in this circuit, this prohibition applies only where there is a transaction directly between a plan and a party having an adverse interest. He argues (b)(2) is inapplicable because there was no transaction directly between the Fund and either ABC or BMC. Goldstein also denies liability under (b)(3). He contends that subsection has always been construed as an "anti-kickback" provision, and that the DOL never alleges that Goldstein was accepting money from some third-party attempting to influence his actions.

III. Discussion
The plaintiff DOL seeks summary judgment under any or all of the three subsections of Section 406(b). Each subsection must be examined in turn to determine whether all the requisite elements have been established.

A. Section 406(b)(1)
Section 406(b)(1) prohibits a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1). Goldstein contends that he is not liable under this subsection because (i) he was not acting as a fiduciary of the plan when he determined what compensation ABC and BMC would receive; and (ii) the assets with which he was dealing were not assets of the plan. Neither contention is persuasive.
Goldstein's contention that he was not acting as a fiduciary of the fund when he determined the commissions that ABC and BMC would charge is unavailing. The three cases Goldstein cites ostensibly to support the proposition that "fiduciary duties under ERISA is not an all-or-nothing concept" are inapposite. The three cases actually support the proposition that a trustee with fiduciary responsibilities over certain limited spheres cannot be held liable as fiduciaries with unlimited capacity to control the trust. See Coleman v. Nationwide Life Ins. Co., 969 F.2d 54, 61 (4th Cir.1992); Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1158 (3d Cir.1990); F.H. Krear & Co. v. Nineteen Named Trustees, 810 F.2d 1250, 1258-59 (2d. Cir.1987). Goldstein, however, does not dispute that as trustee of the Fund, he had influence over which agents contracted with the Fund to recruit employers and had influence over the contribution rates which those agents were contractually responsible for paying to the Fund. Rather, Goldstein simply contends that he was not acting as a fiduciary when he set ABC and BMC's rates. His argument essentially reduces to the contention that a person who concededly has fiduciary responsibilities can simply cease functioning as a fiduciary for a brief period of time to attend to personal business. Goldstein adduces no support for such a contention, and, indeed, the courts of this circuit have been notably unsympathetic to this "separate hats" argument under ERISA where a clear conflict of interest has existed. See Lowen v. Tower Asset Management, Inc., 829 F.2d 1209 (2d Cir.1987); New York State Teamsters Council Health and Hospital Fund v. Estate of DePerno, 816 F.Supp. 138 (N.D.N.Y.1993); Whitfield v. Tomasso, 682 F.Supp. 1287 (E.D.N.Y.1988).
Goldstein also contends that the assets with which he was dealing when he was *1073 setting ABC and BMC commissions, were not assets of the Fund. Goldstein concedes that in the absence of an explicit statutory definition, the term "assets of the Plan" should be determined by the documents governing the relationship between the Fund and the employers. Goldstein points to Section 5.1 of the Trust Agreement, which states "[e]ach participating employer shall pay to the Trustees the required contribution for each eligible employee in accordance with the terms of the collective bargaining agreement between the Union and the contributing employers." Goldstein interprets this provision as limiting "the assets of the Fund" to the payments that ABC and BMC were required to pay to the Fund. Consequently, Goldstein asserts, his decisions as President of ABC and BMC to deduct commissions did not constitute acts "deal[ing] with the assets of the plan."
Goldstein's contention ignores other relevant provisions of the Trust Agreement, as well as the explicit contractual provisions in the Adoption Agreements by which the employers were bound. Section 2.1 of the Trust Agreement states that "the employer contributions ... as well as their proceeds, increments and earnings shall constitute the trust estate." Section 1.4 of the Trust Agreement defines "employer contributions" as "the payments which an employer is required to make to the Fund pursuant to an Agreement." The Adoption Agreements, which created the employers' obligations to make contributions and established the contribution rate, explicitly termed these contributions "monthly contributions to the Welfare Fund." Goldstein moreover concedes, as he must, that these agreements made no mention of the deduction of commissions or fees from the stated contribution rates. The contractual language here, as in Galgay v. Gangloff, 677 F.Supp. 295 (M.D.Pa.1987), thus clearly establishes that the contributions to the Welfare Fund, paid by the employers to ABC/BMC, constituted "plan assets."
Goldstein's contention that he was dealing with ABC's, BMC's or the employers' assets when setting the commission rates is belied further by an analysis of the purposes of ERISA in general and Section 406(b)(1) in specific. Goldstein is contending that until the employer premiums were passed on to the Fund by his wholly owned companies, they were not assets of the plan and that he was free to deal with them for his own interest. Goldstein is urging an artificially narrow construction of the term "assets of the plan," one that has been specifically rejected by at least one Court of Appeals. The Ninth Circuit held in Acosta v. Pacific Enterprises, 950 F.2d 611, 620 (9th Cir.1991):
ERISA does not expressly define the term "assets of the plan." Nor has this circuit had an occasion to delineate the precise boundaries of the terms it is used in section 406(b)(1). However, ERISA's legislative history makes clear that "the crucible of congressional concern was misuse and mismanagement of plan assets by plan administrators and that ERISA was designed to prevent these abuses in the future." Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 140 n. 8[, 105 S.Ct. 3085, 3089 n. 8, 87 L.Ed.2d 96] (1985)....
Appellees argue that the term "assets of the plan" encompasses only financial contributions received by the plan administrators. We decline to cabin the term in such a restricted definition. Congress' imposition of a broad duty of loyalty upon fiduciaries of employee benefit plans counsels a more functional approach. To determine whether a particular item constitutes an "asset of the plan," it is necessary to determine whether the item in question may be used to the benefit (financial or otherwise) of the fiduciary at the expense of plan participants or beneficiaries.
In the instant case it is clear that the commissions extracted by ABC and BMC from the Employer Contributions did benefit the fiduciary at the expense of the plan participants and beneficiaries. Goldstein's scheme of funnelling employer contributions to the Fund through his wholly owned companies and deducting "commissions" before those contributions were paid to the Fund, violates the very essence of trust law, see Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 110, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989) ("ERISA's legislative history confirms that the Act's fiduciary responsibility provisions, ... `codif[y] and mak[e] applicable to *1074 [ERISA] fiduciaries certain principles developed in the evolution of the law of trusts.'"), and offends a fundamental purpose of ERISA as set forth in the first section of the statute, "Congressional findings and declarations of policy":
It is hereby declared to be the policy of this chapter to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, ... by establishing standards of conduct, responsibility and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.
Neither of Goldstein's defenses to Section 406(b)(1) liability is availing. All of the requisite elements for such liability have been demonstrated or conceded,[3] and there is no genuine issue of material fact to be tried. Summary judgment in favor of the DOL is thus proper on the basis of Section 406(b)(1) alone.

B. Section 406(b)(2)
Goldstein contends that he cannot be liable under Section 406(b)(2) because (b)(2) by its terms requires a "transaction" between the Plan and a party whose interests are adverse to the interests of the plan. Goldstein cites Donovan v. Bierwirth, 680 F.2d 263, 270 (2d. Cir.1982) in support of this proposition, and argues that no such transaction occurred in the instant case.[4] Rather, Goldstein suggests, the only transaction was an indirect one between employers and the Fund.
Goldstein's contention in this regard is inherently irreconcilable with his previous contention, in the context of Section 406(b)(1), that ABC and BMC were independent entities which were not dealing with "assets of the plan." Either ABC and BMC were mere conduits for employers to pay their premiums in which case those premiums should have constituted "assets of the plan," or ABC and BMC were independent agents who were transacting with the Fund when they entered into collective bargaining agreements and when they remitted a portion of the employers' premiums to the Fund.
Moreover, previous applications of Section 406(b)(2) to comparable facts suggest that at a minimum Goldstein's act of approving the Fund's dealings with ABC and BMC while simultaneously setting those companies' commissions constitutes a violation of the subsection. See Cutaiar v. Marshall, 590 F.2d 523, 530 (3d Cir.1979) (where trustees of two employee benefit plans are identical but beneficiaries are not, a loan from one plan to the other constitutes a per se violation of Section 406(b)(2)); Marshall v. Kelly, 465 F.Supp. 341, 353 (W.D.Okla.1978) (trustee who represented borrowing company in dealings with Plan, arranging loans and payment from Plan to company violated Section 406(b)(2)). Summary judgment is thus also merited under Section 406(b)(2).

C. Section 406(b)(3)
Goldstein contends that he cannot be liable under Section 406(b)(3) because the subsection is an anti-kickback provision. He contends that in all cases construing this section, the courts have required that there be a third-party who "bribes" a fiduciary. Goldstein contends that it "is absurd to argue that Goldstein" could be bribed by his own company.
In light of the fact that Goldstein's violations of Sections 406(b)(1) and (b)(2) have been clearly established, it is not necessary to reach the issue of whether 406(b)(3) requires that the "party dealing with such *1075 plan" be a third party unrelated to the fiduciary.
The motion for partial summary judgment is thus granted on the issue of Goldstein's liability under Section 406(b). An inquest will be ordered to determine the damages assessable against Goldstein unless the parties agree on the amount within ten days. Otherwise, the inquest is set for January 17, 1994 at 10:00 a.m. at which time the court will take the proofs.
SO ORDERED.
NOTES
[1] Initially, from the Fund's creation in October 1988 until sometime in the Spring of 1990, the Fund's medical benefits were insured through Empire Blue Cross/Blue Shield. In the Spring of 1990, the Fund's trustees decided to self-insure the Fund. Reacting to this decision, two-thirds of the Fund's members decided to leave the Fund. Goldstein contends that he formed BMC to "stabilize" and "save" the Fund by bringing in much needed new members.
[2] Specifically, the DOL seeks summary judgment against defendant Goldstein on paragraphs 43 and 53 of the DOL's third amended complaint. Paragraphs 43 and 53 read as follows:

43. In connection with the payment of commissions from Fund assets to BMC and ABC, defendant Goldstein, as trustee and fiduciary with respect to the Fund, and sole owner of BMC and ABC, dealt with the assets of the Fund in his own interest and for his own account, acted in transactions involving the Fund on his own behalf, and received consideration for his own personal account from parties (BMC and ABC) dealing with the Fund in connection with transactions involving Fund assets, all in violation of ERISA sections 406(b)(1), (2), and (3), 29 U.S.C. §§ 1106(b)(1), (2) and (3).
. . . . .
53. Defendant Goldstein used his authority and control, as a fiduciary with respect to the Fund, to cause the Fund to retain BMC as the Fund's administrator. As the sole owner of BMC, defendant Goldstein dealt with the assets of the Fund in his own interest and for his own account, acted in transactions involving the Fund on his own behalf, and received consideration for his own personal account through BMC's arrangement with the Fund in connection with transactions involving the Fund's assets, all in violation of ERISA sections 406(b)(1), (2), and (3), 29 U.S.C. § 1106(b)(1), (2), and (3).
[3] Goldstein concedes that (1) he was a trustee of the Fund at the time in question; (2) that he continued to run ABC and set up and ran BMC during the time in question; and (3) that both ABC and BMC were compensated through fees and commissions for their services. The final requisite element is that he dealt with the assets of the plan, which, as discussed above, I believe is demonstrated.
[4] In Donovan, the Second Circuit declined to hold that the purchase of a corporation's stock by the trustees of that corporation's pension plan, when the corporation was the subject of a hostile tender offer, constituted a violation of 406(b)(2). The Court implied that no transaction had occurred between the plan and a party having an adverse interest. The Court explicitly distinguished the facts in Donovan, from clear "cases of self-dealing."