**Theofanis DARDAGANIS, et al., as Trustees of the Retirement Fund of the Fur Manufacturing Industry, Plaintiffs,**

v.

**GRACE CAPITAL, INC. and H. David Grace, Defendants.**

**No. 86 Civ. 6135 (RWS).**

United States District Court, S.D. New York.

June 30, 1987.

Gaston, Snow, Beekman & Bogue, New York City (Christopher O'Brien, of counsel) and Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C. (William F. Hanrahan, James H. Hulme and Ronald L. Castle, of counsel), for plaintiffs.

Robert E. Anderson, New York City, for defendants.

## OPINION

SWEET, District Judge.

The plaintiffs Trustees of the Retirement Fund of the Fur Manufacturing Industry (the "Fund") have moved pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment in their favor with respect to Count II of the complaint. For the reasons discussed below, the motion is granted in part and denied in part.

## FACTS

The following facts are not in dispute, except as noted. The Fund, a multiemployer pension plan with offices in New York City, provides pension benefits to approximately 5,000 current or former employees in the fur garment industry and their beneficiaries. Grace Capital, Inc. ("Grace Capital") was, from August, 1981 through October, 1984, an investment adviser registered under the Investment Advisers Act of 1940. H. David Grace ("Grace") was the chief executive officer, chairman, and principal shareholder of Grace Capital.

On August 28, 1981 the Trustees retained Grace Capital to manage the Fund's assets of between $10 and $11 million.[1] The Fund and Grace Capital entered into an Investment Management Agreement (the "Agreement"), executed by the Trust-

---

1. While the Trustees contend that the assets of the Fund totalled $10.7 million, Grace claims that the figure should be $10.3. The actual amount is irrelevant for purposes of this motion.

ees and Grace on behalf of Grace Capital. Paragraph 3 of the Agreement stated:

> Grace [Capital] shall manage the Account in strict conformity with the investment guidelines promulgated by the Trustees from time to time and with all applicable Federal and State laws and regulations. The most recent guidelines adopted by the Trustees and to be followed by Grace [Capital] until Grace [Capital] is notified of a change are set forth in Exhibit A.

The first provision of the guidelines in Exhibit A stated that:

> Common stocks held shall not exceed 25% of the cost of the securities in the Account. Changes in the market value after the purchase of a security which increases the proportion to more than 25% for common stocks shall not violate the standards.

The Agreement also provided for changes in the guidelines. Paragraph 11 stated that "Grace [Capital] shall be guided by the guidelines in Exhibit A in the purchase of securities unless and until it receives written notification of changes from the Fund." For such changes, Grace Capital was permitted to "rely and act upon any written communications from the Investment Subcommittee or the Executive Secretary of the Fund as a communication from the Board of Trustees." Agreement at ¶ 9.

Following the initial execution of the Agreement, Grace on two occasions recommended to the Trustees that the guidelines' equity limit be raised. On May 3, 1982, he recommended an increase in the maximum investment in equities from 25% to 35%. The Trustees approved and adopted the recommendation. Their adoption was recorded in written minutes of the Trustees' meeting. On September 16, 1982, Grace recommended an increase in the equity limit from 37.7% to 50%. This, too, was approved by the Trustees and recorded in the minutes.

On the Grace Capital June 30, 1983 report, the Fund's equity holdings amounted to 54% of total assets. On this date, the unrealized gain on the equity holdings was $1,015,651, according to Grace Capital's re-

port. Thereafter, there was a steady increase in the equity percentage of the portfolio, matched by a steady decrease in the aggregate value of the equities held. The following table, drawn from Grace Capital's own reports, shows the pattern:

| Report Date | Percentage of Portfolio in Equities on Cost Basis | Net Unrealized Gain or (Loss) in Equities on Report Date |
|---|---|---|
| 06–30–83 | 54% | $1,015,651 |
| 08–31–83 | 61% | ($25,208) |
| 09–30–83 | 64% | ($261,826) |
| 10–31–83 | 65% | ($1,495,444) |
| 11–30–83 | 67% | ($933,341) |
| 12–30–83 | 68% | ($1,054,113) |
| 01–31–84 | 70% | ($1,182,428) |
| 02–29–84 | 67% | ($2,422,115) |
| 03–30–84 | 73% | ($2,618,257) |
| 05–31–84 | 77% | ($4,178,422) |
| 06–29–84 | 78% | ($4,040,344) |
| 07–31–84 | 81% | ($4,673,072) |
| 09–28–84 | 79% | ($3,301,124) |
| 10–31–84 | 81% | ($3,642,045) |

On January 31, 1984, a date on which the percentage of equity to total assets was 70% and seven months after the percentage as stated in the reports first went over 50%, Grace recommended an increase in the 50% limit on equity in stocks. On February 7, 1987, the Trustees rejected that recommendation, and Grace was so informed. The Trustees never approved in writing an increase in the limit on equity holdings to any figure above 50%.

By September 28, 1984, the equity percentage was 79% and the net downward change in the net unrealized gain in equities totalled $4,316,775. On October 9, 1984, Grace Capital was terminated as the Fund's investment manager.

**Summary Judgment**

Fed.R.Civ.P. 56(c) provides that a court shall grant a motion for summary judgment if it determines that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Summary judgment may not be granted if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91

L.Ed.2d 202 (1986); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party.

*Knight v. United States Fire Ins. Co.*, 804 F.2d 9 (2d Cir.1986).

A court must also decide that any disputed issues are not material to the outcome of the litigation. *Id.* Furthermore, a party cannot defeat a motion for summary judgment by relying on "mere speculation or conjecture as to the true nature of the facts," even where it is alleged that evidence to support a claim lies within the exclusive control of the defendants. *Id.*

Therefore, summary judgment is appropriate where the evidence favoring the non-moving party is insufficient for a jury to return a verdict for that party. *Anderson*, 106 S.Ct. at 2511. This standard mirrors that for a directed verdict under Fed.R. Civ.P. 50(a), which instructs the trial judge to direct a verdict if but one reasonable conclusion as to the verdict can be drawn from the evidence before the jury. *Id.*

### Conclusions

By agreeing to become the Fund's investment manager, Grace Capital assumed the obligation to manage the assets prudently and solely in the interest of plan participants. *See* 29 U.S.C. § 1104(a)(1)(A) and (B). It also assumed the statutory obligation to manage the assets "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). Among those documents governing the plan is the Agreement. Any violation of the terms of that Agreement constitutes a breach of Grace Capital's fiduciary duty under § 1104(a)(1)(D) and creates liability to the Fund under 29 U.S.C. § 1109 "to make good to such plan any losses to the plan resulting from each such breach." The Trustees contend that, by exceeding the 50% limit, Grace Capital violated the Agreement and is liable for any resulting loss.

### Computation of the Percentage

Grace Capital first argues that questions of fact exist with respect to the way in which the limit is calculated, beginning with the meaning of "common stock" in the first paragraph of the guidelines. Grace argues that "common stock," the numerator in the percentage calculation, should exclude preferred stock, since Grace received approval from the Trustees to carve out preferreds. The Trustees argue that there is no factual dispute, since Grace asked in writing on September 13, 1983 for this preferred stock "carve-out" (a document that has not been presented to the court) and was never granted such an exclusion in writing as required by the Agreement.

Although the guidelines refer only to "common stock," both parties, by acknowledging the request to carve out preferreds, implicitly agree that at some point in time that term was modified to include preferred stock. Embodying this modification is the May 3, 1982 written approval of an increase in the limit from 25% to 35%, which refers to "the maximum investment in equities," and the September 16, 1982 approval of an increase to 50%, which refers to the "equity limit." Furthermore, in his deposition Grace acknowledged that the interpretation of the guidelines moved away from the wording "common stock" to "equities" and then to "stocks."

Whether or not there was an oral modification of the guidelines that would exclude preferred stock from the numerator in the percentage calculation, the Agreement's requirement of written authority renders that factual dispute irrelevant. Since preferred stock was not excluded in writing, as a matter of law the Agreement dictates that preferred stock be included in the numerator.

Even if the alleged oral agreement were to be taken as a modification of the Agreement, it would not affect any determination of liability. The cost of the preferred stock held by Grace Capital in the Fund's Account on September 28, 1984 was only 4%

of the total portfolio. The equity percentage as a whole was 79%. Even if preferreds were removed from the equity category, the cost of equity items would still be substantially greater than the 50% limit. Accordingly, the maximum impact of a carve-out of preferreds would be to reduce the damages, if any, owed to the Fund.

Grace further alleges a factual dispute with respect to the interpretation of "the cost of the securities in the Account" for purposes of making the percentage calculation required by the guidelines. However, the definition of cost advanced by the Trustees is the one Grace himself gave in deposition, and is a reasonable interpretation of the Agreement. Cost, as stated by Grace, is the original cost of all stocks and bonds in the portfolio, including cash at 100 cents on the dollar.

Grace further contends that the large amounts of cash withdrawn from the account over time should in fairness be tallied back in to avoid distortion to the percentages. Grace correctly notes that withdrawals of cash from the account drive up the percentage of the portfolio invested in equities, even without further purchase of equities. He argues, in essence, that when something other than the purchase of stock drove up the equity percentage, namely, the withdrawal of cash, the Agreement did not require him to sell stock to maintain compliance.

This argument is contrary to the words and spirit of the Agreement. The equity percentage limitation in Exhibit A to the Agreement refers expressly to "common stocks *held*" (emphasis added) by the Fund, not merely to the common stock purchased. Thus, Grace was required by the language of the Agreement to sell equity holdings if necessary to bring their proportion within the portfolio limits. The obvious purpose of this provision was to diversify the Fund's investments to restrict its potential exposure to price declines in the equity sector of its portfolio. In this context, it is inconceivable that the Agreement would, as Grace suggests, envision an investment of $8 million out of a $16 million portfolio in equities and a subsequent withdrawal of

cash and liquidation of bonds that would push the equity percentage toward 100%.

Therefore, no factual issue as to the meaning of "cost" in Exhibit A to the Agreement remains.

**Waiver of Compliance with the Percentage**

The determination that Grace Capital allowed the equity percentage to go over the 50% limit from June, 1983 to October, 1984, when Grace Capital was terminated as investment adviser, does not end the inquiry into liability. Although the Agreement calls for "strict conformity with the investment guidelines," Grace argues that the general understanding in the investment management business is that percent guidelines merely establish a rough demarcation zone to assist the manager in portfolio allocation. At least with respect to calculation of damages, Grace should be permitted to prove that such is the custom and practice in the industry and that any interpretation of the Agreement should conform therewith.

Grace further contends that the Trustees were fully aware of the violation of the Agreement for over 15 months, yet did nothing to enforce it, thereby waiving strict compliance with the guidelines' percentage. Under New York law, approval or acceptance of performance differing from that required by the contract constitutes a waiver of performance in accordance with the contract. *See Mississippi Shipbuilding Corp. v. Lever Bros. Co.*, 237 N.Y. 1, 142 N.E. 332 (1924); *In re Wilaka Construction Co.*, 17 N.Y.2d 195, 269 N.Y. S.2d 697, 216 N.E.2d 696 (1966). A trier of fact might reasonably infer that the Trustees knew of the equity percentage in the portfolio and implicitly agreed to a percentage greater than 50% at some time between June, 1983 and October, 1984, even though they explicitly declined to increase the equity in stocks on February 7, 1984. The Trustees at least quarterly received copies of the portfolio print-outs from Grace Capital, from which the percentage could be easily calculated. On the day an increase of the 50% limit was requested, in fact, the equity percentage was 70%.

Grace alleges that after the proposed increase in the equity guideline was declined, he spoke to three of the Trustees by telephone to discuss their view as to whether the denial meant that Grace Capital should undertake a sale program to reduce the percentage of equities in the portfolio. None of these three Trustees suggested or implied that it was appropriate to undertake a sale program. Grace also alleges that at no time subsequent to these conversations, including the meeting in October, 1984, when Grace Capital's performance was reviewed by the Trustees, were reservations expressed to him of any concern with Grace Capital's adherence to investment guidelines, including percentages.

Such a defense under New York contract law, however, does not present a defense to an action under ERISA for violation of the Agreement. The limitation provision was designed to protect the interests of the Fund's participants and beneficiaries. Not only Grace Capital, but the Trustees as well, as named fiduciaries to the Fund, were bound by § 1104(a)(1)(D) to comply "in strict conformity" with the written plan document. In order to fulfill ERISA's purpose in protecting the beneficiaries of such funds, the Trustees should not be able, by negligence in enforcing the Agreement, to waive the requirements of the Agreement designed to protect those beneficiaries.

Independent breaches of duty by the Trustees, such as informal oral condonations of violations of the Agreement, or passive negligence in enforcing it, do not constitute a defense for Grace to this action on behalf of the Fund to recover losses stemming from a violation of the Agreement. *See Rosen v. Rosen*, 78 A.D.2d 911, 432 N.Y.S.2d 921, 923 (1980) ("One who knowingly engages with a fiduciary in a breach of trust is liable to the *cestui que* trust for damages that result."); Restatement (Second) of Trusts § 326 (1959); 4 A.W. Scott, the Law of Trusts 2553 (3d ed. 1967) ("If the third person has knowingly assisted the trustee in committing a breach of trust, he is liable for participation in the breach of trust."). Thus, the only remaining issue of fact with respect to waiver is the possibility of a more lenient interpretation of the Agreement, based on custom and practice.

**Amount of Loss**

Since there was a violation of § 1104(a)(1)(D), Grace Capital must "make good" to the Fund "any losses ... resulting from" the violation. The Trustees contend that the amount of that loss is the market value downturn in the equity portion of the portfolio between the first violation of the 50% limit on June 30, 1983 and liquidation of the portfolio, an amount in excess of $4,672,000. Grace Capital asserts, however, that the proper period of time by which to measure any loss is the duration of Grace Capital's tenure as investment manager, a period in which the Fund earned as a whole $5 million and in which closed-out transactions in equity positions completed before Grace's termination totalled almost $4 million. He further asserts that equity trades during the period February to October, 1984 netted $67,000.

A question of fact remains as to the amount of loss, because neither theory asserted by the parties is the correct one for computing loss. In *Donovan v. Bierwirth*, 754 F.2d 1049 (2d Cir.1985), the Second Circuit held that the measure of loss requires "a comparison of what the Plan actually earned [on the improper investment] with what the Plan would have earned had the funds been available for other Plan purposes." *Id.* at 1056. Further, in determining what the Fund would have earned had funds been available, this court "should presume that the funds would have been treated like other funds being invested during the same period in proper transactions." *Id.* The Second Circuit noted:

such a determination is of necessity somewhat arbitrary ... without purporting to catalogue the relevant factors exhaustively, they include at least (1) market conditions and abnormalities affecting the price of the improperly purchased stock; (2) such conditions as they affect the price of other assets of the plan at issue; (3) the court's determination of

the relative price advantages to the plan of selling or holding the stock; and (4) the interests of the beneficiaries of the plan.

*Id.* at 1058.

The starting point of the calculation should be the amount of stock held that *exceeded* the 50% limit, ranging from 4% on June 30, 1983 to 29% on September 28, 1984.[2] It is only this percentage that can give rise to any losses, since investments in stocks up to 50% were within the letter of the Agreement.

Using *Donovan*'s command to "presume that the funds would have been treated like other funds being invested during the same period in proper transactions," 754 F.2d at 1056, it is appropriate to calculate damages by taking the amount of money improperly invested in stocks during the period from June 30, 1983 on, that is, the amount represented by the excesses of 4% to 29% (or more), and multiplying it by the return made on the bonds during that same period, with any appropriate adjustments. The resulting number would be the amount that should have been made. Then the loss on the amount of money improperly invested in stocks should be calculated, possibly as a percentage of the total loss on stocks during that period. The total loss would be the amount that should have been made, had the money been invested in bonds similar to those comprising the remainder of the portfolio, minus the loss from investing that 4% to 29% in stocks. Because these and other factual issues are present, summary judgment on the issue of damages is denied.

**Personal Liability under ERISA**

█ While Grace Capital is clearly liable for losses resulting from violations of the Agreement as a fiduciary under ERISA, 29 U.S.C. § 1002(21)(A), an issue is presented as to the personal liability of Grace as a fiduciary under that section. Section 1002(21)(A) provides in pertinent part:

a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

Grace was the president and chief executive officer and principal shareholder of Grace Capital. He has acknowledged that he was solely responsible for all investment decisions made on behalf of the Fund account, although Grace Capital was the only signatory to the Agreement. Consistent with that acknowledgment, though not dispositive of this claim, is the condition in the Agreement that Grace was to "personally supervise and manage the Account in behalf of [Grace Capital]." Agreement ¶ 4. Therefore, there is no dispute that Grace, as well as Grace Capital, falls within ERISA's definition of a fiduciary.

Grace contends, however, that under ERISA as under the common law, an individual cannot be held liable for breaches of fiduciary duty by the corporation providing fiduciary services without a showing that he "dominated and controlled the intervening corporate entities, and through that domination and control, ... accomplished his personal ends and enterprises." *Crocker v. Pitti*, 179 Md. 52, 58, 16 A.2d 875, 877 (1940), *cited in Brink v. DaLesio*, 496 F.Supp. 1350, 1382 (D.Md.1980), *rev'd on other grounds*, 667 F.2d 420 (4th Cir.1981). Grace argues, in other words, that he is not personally liable for any losses unless the Trustees make a showing that the corporate veil should be pierced.

Although this is the standard under the common law, the purpose and legislative history of ERISA indicate that the Trustees need not make such a showing here. "In broad outline, [ERISA was] designed

---

**2.** The cutoff point also gives rise to a question of fact, since some of the stocks bought by Grace Capital while it was the Fund's investment ad- viser were not sold until sometime after Grace Capital's termination.

... to make sure that [participants] do not lose their benefits as a result of ... failure of the plan to accumulate and retain sufficient funds to meet its obligations...." S.Rep. No. 383, 93rd Cong., 1st Sess. 1, *reprinted in* 1974 U.S.Code Cong. & Ad. News 4639, 4890. In order to assure uniformity of protection for participants, ERISA contains broad language preempting the application of state law to benefit trusts. *See* 29 U.S.C. § 1144.

ERISA specifically addresses the duties and liabilities of fiduciaries, beginning with an objective definition of fiduciary. Any person who, in fact and practice, exercises discretion over plan assets is a fiduciary. "[T]he definition of fiduciary is of necessity broad and it intends to impose strict duties on those whose activities bring them within the definition. There [is no] requirement of a written or other formal acknowledgment of fiduciary status." Employee Retirement Income Security Act of 1974, Pub.L. No. 93–406, material explaining H.R. 12906 Together with Supplemental Views (to accompany H.R. 2) (Feb. 25, 1974), Reprinted in Senate Comm. on Labor and Public Welfare, 94th Cong., 2nd Sess., Legislative Hist. of ERISA at pg. 3309. The legislative history further provides:

> any person with a specific duty imposed on him by this statute [is] deemed to be a fiduciary. This is a departure from current judicial precedents but is necessary to the proper protection of these plans. Imposition of the duty will of course give rise to liability for any breach of such duty. *Id.*

ERISA § 1109 explicitly provides that "[a]ny person who is a fiduciary with respect to a plan who breaches any of the ... obligations ... imposed upon fiduciaries ... shall be personally liable...." Senator Williams stated that, "[a]s a deterrent to mismanagement or irresponsible acts or judgments affecting pension assets, a fiduciary breaching such trust would become personally liable for losses sustained." Staff of Senate Comm. on Labor and Public Welfare, 94th Cong., 2d Sess., Legislative History of ERISA, Public Law 93–406 (Comm. Print 1976).

One court has imposed liability on an individual who was an officer of a corporate administrator of a plan, where he retained "discretionary authority or discretionary control respecting management." *Freund v. Marshall & Ilsley Bank*, 485 F.Supp. 629, 640–41 (D.Wis.1979). As the Court stated:

> While it is indeed contemplated under ERISA that a corporation, as an entity, may be a plan fiduciary, the analysis does not end there. Individuals within the corporation who exercise the type of authority or control described in Section 3(21)(A) of ERISA will themselves be fiduciaries.

*Id.*, at 641; *see also Donovan v. Bierwirth*, 754 F.2d 1049, 1052 (2d Cir.1985) (noting the personal liability of trustees who breach their fiduciary duties).

Therefore, under ERISA, even though Grace Capital was the named investment adviser of the Plan, Grace is personally liable as a fiduciary as the person who exercised complete discretion over the disposition of the Fund assets.

IT IS SO ORDERED.