Theofanis DARDAGANIS, Harry Eagleberg, Martin Geller, Arthur Kotoros, Paul Raphael, Philip Simadiris, as Trustees of the Retirement Fund of the Fur Manufacturing Industry, Plaintiffs–Appellees,

v.

GRACE CAPITAL INC. and H. David Grace, Defendants–Appellants.

No. 29, Docket 88–7611.

United States Court of Appeals,
Second Circuit.

Argued Aug. 30, 1989.
Decided Nov. 16, 1989.

1238

Robert E. Anderson, New York City, for defendants-appellants.

Robert E. Anderson, New York City, for defendants-appellants.

Ronald L. Castle, Washington, D.C. (Rodney F. Page, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., Christopher E. O'Brien, Gaston & Snow, New York City, on brief), for plaintiffs-appellees.

Before FEINBERG and NEWMAN, Circuit Judges, and DUMBAULD, Senior District Judge.*

JON O. NEWMAN, Circuit Judge:

This appeal concerns enforcement of the duty ERISA imposes upon fiduciaries of employee benefit plans to act "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D) (1982). Grace Capital Inc. ("GCI") and H. David Grace ("Grace") appeal from a judgment entered in the District Court for the Southern District of New York (Robert W. Sweet, Judge) awarding the trustees of the Retirement Fund of the Fur Manufacturing Industry (the "Fund") $1,507,174. The Court concluded that GCI and Grace breached their fiduciary duties to the Fund by deviating from the written agreement governing GCI's actions as investment manager of the Fund's assets. We affirm the District Court's finding of liability as to GCI and its finding of personal liability as to Grace but remand for further fact-finding on one of the damage issues.

* The Honorable Edward Dumbauld of the District Court for the Western District of Pennsylvania, sitting by designation.

## Background

GCI is a registered investment advisor. Grace is president, chief executive officer, and principal shareholder of GCI. On August 28, 1981, GCI entered into a four-page Investment Management Agreement (the "Agreement") with the plaintiffs, who are trustees (the "Trustees") of the Fund. Under the terms of the Agreement, GCI became investment manager of the assets of the Fund and promised to "manage the [Fund's] Account in strict conformity with the investment guidelines promulgated by the Trustees from time to time and with all applicable Federal and State laws and regulations." The Agreement further provided that Grace would "personally supervise and manage the Account" in behalf of GCI and that any changes in the Trustees' guidelines would have to be in writing in order to be effective. Attached as a one-page exhibit to the Agreement was a list of four guidelines (the "Guidelines"), limiting GCI's investment discretion. Central to the present appeal is the first of these Guidelines, which placed the following restriction on the proportion of fund assets that GCI could invest in common stocks:

> (1) Common stocks held shall not exceed 25% of the cost of the securities in the Account. Changes in the market value after the purchase of a security which increases [*sic*] the proportion to more than 25% for common stocks shall not violate the standards.

Over the three years that GCI acted as advisor to the Fund, this ceiling on common stock holdings was raised twice: to 35% in May 1982 and to 50% in September 1982. Both of these changes were recorded in the minutes of a Trustees' meeting, a form of documentation that both parties agree satisfies the Agreement's requirement that changes in the Guidelines be in writing. It is also undisputed that at the time of both the May and September 1982 Trustees' meetings, where the Trustees approved a raise in the ceiling, the percentage (on a cost basis) of common stock holdings already exceeded the applicable limit. Prior to a February 1984 Trustees' meeting, GCI proposed a further increase in the ceiling to 70%. During the eight-month period preceding this meeting, the common stock percentage had exceeded the 50% ceiling each month by an average of roughly 15 percentage points. The Trustees refused to increase the ceiling above 50%. Nevertheless, the equity holdings of the Fund's portfolio continued to increase until they reached about 80% in October 1984. At that point Grace and GCI were fired.

At the same time as the percentage of the Fund's equity holdings was increasing, the value of those holdings was decreasing. In June 1983, there had been an unrealized gain of $1,015,651 on equities; by October 1984, there was an unrealized loss of $3,642,045.

In August 1985, the Trustees brought suit, alleging that both defendants had breached a fiduciary duty, 29 U.S.C. § 1104(a)(1)(D), by failing to abide by the documents governing the plan and were thus liable to the Fund, under section 1109(a), for any losses the Fund sustained as a result of the breach.[1]

The district court granted a motion for partial summary judgment on the issue of liability. *Dardaganis v. Grace Capital Inc.*, 664 F.Supp. 105 (S.D.N.Y.1987). The Court held that section 1104's requirement that fiduciaries abide by the plan documents together with the Agreement's provision that GCI manage the account "in strict conformity with the investment guidelines" required the Court to conclude, as a matter of law, that "[a]ny violation of the terms of [the] Agreement constitutes a breach of Grace Capital's fiduciary duty under § 1104(a)(1)(D) and creates liability to the Fund under 29 U.S.C. § 1109." *Id.* at 108. The District Court rejected defendants' argument that there were factual disputes as to whether preferred stock was subject to the equity percentage limit and whether the percentage was intended to be

---

1. Section 1109(a) provides, in relevant part:
   Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this sub-chapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach....

a strict limit or only a rough guideline. The Court found that the Agreement required GCI to conform to the 50% limitation—by liquidating stock, if necessary—even when cash withdrawals by the Trustees to meet Fund obligations resulted in an increase in the percentage of common stock above the 50% line. The Court also rejected defendants' arguments that the Trustees waived strict adherence to the 50% Guideline by not earlier enforcing it while aware of its violation. The Court held that such a defense under New York contract law is not a valid defense in an action for breach of fiduciary duty under ERISA. 664 F.Supp. at 109–10.

With respect to Grace, the Court found that, although he did not sign the Agreement in his personal capacity, he nevertheless became a fiduciary to the Plan because he was not only president, chief executive officer, and principal shareholder of GCI, but also was "solely responsible for all investment decisions made on behalf of the Fund account." *Id.* at 111. The Court initially denied summary judgment as to damages, finding that neither theory of "losses" to the Plan, 29 U.S.C. § 1109(a), offered by the parties was in accord with our opinion in *Donovan v. Bierwirth*, 754 F.2d 1049 (2d Cir.1985). Judge Sweet interpreted *Donovan* as requiring, in this context, a comparison of what the Plan actually earned with what it would have earned had GCI invested only 50% of the Fund's account in equities. For the purpose of litigating the damages question, Judge Sweet directed the parties to assume that the money invested in these excess holdings of stock would have been invested in the Fund's non-equity holdings during the relevant time period and would have returned a comparable yield.

In a second decision, *Dardaganis v. Grace Capital Inc.*, 684 F.Supp. 1196 (S.D. N.Y.1988), the Court analyzed the expert affidavits of both sides and granted summary judgment to the plaintiffs on the issue of damages. After defendants' motion for reargument was denied and the District Court made some minor alterations in its judgment, this appeal followed.

## Discussion

### I. Scope of Fiduciary Duty Under Section 1104(a)(1)

■ GCI raises two principal objections to the District Court's liability holding. First, it maintains that the Court erred in concluding, at the summary judgment stage, that GCI violated the Guidelines because there was a dispute as to whether the parties intended the 50% ceiling to be a strict limit or only a rough benchmark, as GCI maintains is the custom in the industry. Second, it argues that a fiduciary's failure to abide by the plan documents is not necessarily a breach of duty, but that liability requires conduct that was not prudent under the circumstances. The District Court correctly rejected both of these arguments.

With respect to the character of the 50% ceiling, the Agreement plainly stated that GCI would manage the account "in strict conformity with the investment guidelines promulgated by the Trustees." We need not consider whether such language in a plan document covered by section 1104 requires a finding of liability even for small percentage deviations from a prescribed limit. In this case, GCI greatly exceeded the 50% ceiling during a 16–month period preceding its termination in October 1984. For most of this period, the portfolio's equity holdings exceeded 65%; for the last five months these holdings exceeded 75%. In light of these undisputed facts, the District Court correctly ruled that no reasonable fact-finder could conclude that GCI had complied with the Guidelines.

Nor does the defendant's claim that the parties agreed not to regard shares of preferred stock as "equities" for purposes of the ceiling preclude summary judgment as to liability. As the District Court noted, the percentage of preferred stock in the portfolio was only 4%. Even if this 4% were subtracted from the total equity percentages relied upon by the District Court, the fact remains that GCI allowed the portfolio, over an extended period of time, to hold a percentage of common stock far in excess of 50%.

■ The District Court was also correct to reject defendant's argument that the Trustees' awareness that GCI had exceeded the 50% limit without voicing any objection raised a factual issue precluding summary judgment. As the District Court noted, ERISA's requirements that employee benefit plans be put in writing, 29 U.S.C. § 1102, and that fiduciaries comply with the written documents serve to protect the participants and the beneficiaries. "ERISA was deliberately structured so that legal responsibility for management of ERISA plans would be clearly located." *Lowen v. Tower Asset Management, Inc.*, 829 F.2d 1209, 1218 (2d Cir.1987). A rule of state contract law that would effectively vary the terms of the written document or permit trustees to waive the right of beneficiaries to strict adherence by fiduciaries would impair these federal policies. *Cf. Miller v. Lay Trucking Co., Inc.*, 606 F.Supp. 1326, 1333 (N.D.Ind.1985) (state contract law preempted by ERISA where common law claim "goes to the terms of [a] pension agreement" and would "directly infring[e] on the federal scheme"). Unlike ordinary breach of contract actions in New York, in which the right to strict adherence may be waived by failure to object to performance that deviates from the written document, *see, e.g., Mississippi Shipbuilding Corp. v. Lever Brothers Co.*, 237 N.Y. 1, 142 N.E. 332 (1923), the trustees of an ERISA plan cannot waive the right of the beneficiaries to have fiduciaries comply with section 1104(a)(1)(D). *Cf. Nachwalter v. Christie*, 805 F.2d 956, 959–61 (11th Cir. 1986) (rejecting applicability of common law principle of estoppel under section 1102); *Saret v. Triform Corp.*, 662 F.Supp. 312, 315–16 (N.D.Ill.1986) (refusing to apply principles of estoppel and waiver).

To the extent that plan trustees are negligent in enforcing the rights of beneficiaries, they might be subject to separate suit by those beneficiaries or, perhaps, to suit by co-fiduciaries for indemnification or contribution. *See* 29 U.S.C. § 1105 (1982); *Alton Memorial Hospital v. Metropolitan Life Insurance Co.*, 656 F.2d 245, 250 (7th Cir.1981). *But see Mutual Life Insurance Co. v. Yampol*, 706 F.Supp. 596 (N.D.Ill. 1989) (dismissing trustee's claim for contribution under section 1105). Such potential actions against trustees, however, do not prevent them from recovering, on behalf of the plan, losses caused by the actions of other fiduciaries. We do not understand the District Court's opinion, in rejecting GCI's waiver defense, to say that section 1104(a)(1)(D) displaces all of state contract law with respect to *interpreting* ERISA plan documents, but only that where such documents are clear, state law defenses are invalid when they would frustrate important policies underlying a statutory scheme so broadly preemptive as ERISA.

■ GCI argues, nevertheless, that a failure to act in accordance with plan documents, as required by section 1104(a)(1)(D), does not necessarily constitute a breach of fiduciary duty under section 1109(a). GCI argues that the issue of breach of the fiduciary duties specified in section 1104(a)(1) must be evaluated under an overall prudence standard and that the district court was obligated to review all of the facts concerning the entire three-year relationship between the Trustees and GCI before concluding that exceeding the 50% limit was imprudent and, therefore, a breach of fiduciary duty.

This argument ignores the independent significance of the subdivisions of section 1104(a)(1). Subdivision (B) of section 1104(a)(1) imposes a general duty to act with "care, skill, prudence, and diligence." 29 U.S.C. § 1104(a)(1)(B). Under GCI's interpretation, this duty to act with prudence would be the only duty imposed by subsection 1104(a)(1). But subdivisions (A), (C), and (D) impose more specific duties, such as acting for the exclusive purpose of providing benefits to participants and beneficiaries, *id.* § 1104(a)(1)(A), acting so as to diversify plan investments in order to minimize risk, *id.* § 1104(a)(1)(C), and acting in accordance with plan documents, *id.* § 1104(a)(1)(D). A fiduciary's failure to meet these specific requirements of section 1104(a)(1) is not merely evidence of imprudent action but may, in itself, be a basis for liability under section 1109. *See e.g., Brock v. Citizens Bank of Clovis*, 841 F.2d

344, 346 (10th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 82, 102 L.Ed.2d 59 (1988) (failure to diversify).

The Supreme Court's decision in *Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc.,* 472 U.S. 559, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985), is not to the contrary. In that case, plan trustees relied on a statement in the plan documents granting presumptive validity to their interpretations of the plan's provisions. The Court noted that section 1104(a)(1)(D) does not go so far as to excuse fiduciaries from their duties under other provisions of ERISA merely because they are acting pursuant to a provision of a plan document. *See* 472 U.S. at 568, 105 S.Ct. at 2839. The Court went on to say, however, that absent an "inherent inconsistency" between a provision in a plan document and a fiduciary duty expressed elsewhere in ERISA, the trustees' assertion of contractual rights pursuant to the plan documents was valid. *Id.* In the present case, although GCI attempted to persuade the District Court that its investment decisions were prudent, it made no showing that it would have been imprudent to comply with the 50% ceiling or that such compliance would have required it to breach a fiduciary duty imposed by any provision of ERISA distinct from that of section 1104(a)(1)(D). The District Court was correct in holding that GCI's disregard for the 50% ceiling made it liable for any losses to the plan resulting from the breach, as provided in section 1109(a), without regard to whether the investment decisions seemed prudent at the time.

## II. Personal Liability of Grace

■ The District Court ruled that H. David Grace was personally liable to the Fund for any losses resulting from a breach of fiduciary duty on his part. On appeal, Grace argues that our decision in *Lowen v. Tower Asset Management,* 829 F.2d 1209 (2d Cir.1987), held that personal liability under section 1109 can be imposed only where the individual has used the corporate form as a shield from ERISA liability. In essence, Grace argues that the District Court was wrong to find him personal-ly liable absent circumstances sufficient to warrant piercing GCI's corporate veil.

However, this case is unlike *Lowen* and other decisions dealing with the liability of *non*-fiduciaries under section 1109, *see Thornton v. Evans,* 692 F.2d 1064, 1077–78 (7th Cir.1982); *cf. Leddy v. Standard Drywall, Inc.,* 875 F.2d 383 (2d Cir.1989) (officer of employer can be personally liable even if he did not meet statutory definition of "employer"). The District Court found that Grace "exercised complete discretion over the disposition of the Fund assets," 664 F.Supp. at 112, and hence was a "fiduciary" within the meaning of 29 U.S.C. § 1002(21)(A) (1982). In light of the language of the Agreement ("H. David Grace shall personally supervise and manage the Account") and Grace's own admission that he personally exercised discretion over how the Fund's portfolio was invested, we agree that there is no factual dispute as to Grace's fiduciary status.

Grace, however, characterizes the District Court's approach as imposing "strict liability" on any individual who exercises control or discretion over the assets of an ERISA plan, even when the individual acts through a corporate entity. This is not so. Absent circumstances that warrant disregarding the corporate form under the standards set forth in *Lowen,* individuals are not necessarily liable for any and all of the corporation's fiduciary breaches. First, they are liable as fiduciaries under section 1109 only if they personally breach a fiduciary duty. Second, they are ordinarily not liable for breaches occurring with respect to assets of the plan over which they do not exercise discretionary authority. *See* 29 C.F.R. § 2510.3–21 (1988). Third, such an individual fiduciary faces personal liability for the acts of a co-fiduciary corporation only in certain specific instances. *See* 29 U.S.C. § 1105.

Grace should hardly be surprised that by personally exercising control over the Fund's account he assumed the risk of personal liability. *See Yeseta v. Baima,* 837 F.2d 380, 386 (9th Cir.1988). ERISA specifies that a fiduciary who breaches a duty to the plan "shall be *personally* liable

to make good to such plan any losses to the plan resulting from each such breach." 29 U.S.C. § 1109(a) (emphasis added). Moreover, the Department of Labor's interpretive bulletins concerning ERISA anticipate and permit the efforts of corporate plan fiduciaries to indemnify employees who perform fiduciary services. 29 C.F.R. § 2509.75–4 (1988). The department's regulations also interpret section 1002's definition of "fiduciary" as extending to corporate officers, directors, and partners when they personally render investment advice through their affiliated corporation. 29 C.F.R. § 2510.3–21 (1988). We need not consider the issue of personal liability where non-managerial employees merely render advice or appear to exercise discretionary authority though their decisions must be approved by corporate officers; Grace not only managed the account personally but was also president and chief executive officer of GCI. Under these circumstances, he should have fully anticipated his exposure to personal liability as a fiduciary when he disregarded the 50% ceiling.

III. Damages Under Section 1109

Section 1109 provides that a fiduciary who has breached a duty owed to a plan is liable for "any losses to the plan resulting from each such breach." In this case, the District Court concluded that the measure of the damages caused by investing more than 50% of the Fund's assets in equities was the difference between the earnings of the Fund as invested and what the earnings would have been if the 50% limit had been observed and the assets had been invested in non-equity securities instead. The Court then interpreted our opinion in *Donovan v. Bierwirth*, 754 F.2d 1049 (2d Cir.1985), as permitting an averaging technique. In essence, since it is impossible to know after the fact which stocks GCI would have sold to comply with the 50%

guideline, the Court assumed that at the end of each reporting period GCI would have liquidated an equal proportion of each stock held, sufficient to reduce the total stock holdings to 50% of the Fund's assets (with all holdings valued at cost).[2] The Court then assumed that the money generated by reinvesting the proceeds from the sale of the excess shares would have earned a rate of return equal to that of the non-equity securities held by the Fund during this time period.

■ Defendants raise several objections to this method of calculating damages. First, they suggest that even if they breached a duty, there were no "losses" to the plan because the sum of the Fund's assets and the cash withdrawn to meet Fund obligations increased during their tenure. This argument ignores our opinion in *Donovan v. Bierwirth, supra,* where we said that an "appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust." 754 F.2d at 1056. If, but for the breach, the Fund would have earned even more than it actually earned, there is a "loss" for which the breaching fiduciary is liable.

■ Next, defendants argue that the District Court's averaging technique is incorrect. They maintain that the Court must look at specific investment decisions and determine whether the Fund lost any money as a result of those particular decisions. Under this method, the trial judge would have to determine which purchase or refusal to sell caused the portfolio to exceed the 50% limit. This would give GCI an opportunity to show that the decisions that resulted in excess equity generally were associated with successful stocks. Hence, absent the breach, the portfolio would have contained a greater percentage of less successful stocks and would not have performed as well as the District

2. A simplified example will illustrate the calculation. Suppose that the Fund held $100,000 of stock A and $25,000 of stock B and that total assets were $200,000. Stocks would be 62.5% of the Fund. To reduce the $125,000 stock holdings to $100,000 (50% of the Fund) would re-

quire a reduction in stock holdings of 20% ($125,000–$100,000)/$125,000. Selling 20% of stock A ($20,000) and 20% of stock B ($5,000) would reduce stock A to $80,000 and stock B to $20,000, for a total of $100,000, or 50% of the total assets.

Court presumed, using its averaging technique.

Although *Donovan* did not encounter this precise contention, the District Court correctly interpreted that decision not to require inquiries into specific investment decisions. Where, as in this case, the breach arises from a pattern of investment rather than from investment in a particular stock, courts will rarely be able to determine, with any degree of certainty, which stock the investment manager would have sold or declined to buy had he complied with investment guidelines. Drawing upon the common law of trusts in *Donovan*, we said that the District Court should presume that, but for the breach, the funds would have been invested in the most profitable of the alternatives and that the errant fiduciary bears the burden of proving that the fund would have earned less than this amount. *See id.* at 1056. In *Donovan*, we did not discuss how the fiduciary could meet this burden, other than to say that uncertainties in fixing damages will generally be resolved against the wrongdoer. *See id.* There may be cases in which a defendant comes forward with particularly reliable evidence that, had the funds not been improperly invested, they would have been put into a particular alternative investment. In such cases, it may be inappropriate to decide by summary judgment that the funds in question would have yielded a return equal to the average rate of the rest of the portfolio. In this case, however, the affidavits of Grace and of defendant's expert did not assert any such particular facts. The latter contains only a general assertion that 90–day U.S. Treasury bills would have been a more appropriate alternative investment. Since the defendants did not show that, at trial, they would be able to overcome the presumption we articulated in *Donovan*, the District Court correctly found no issue of fact as to the method of liquidating stock to reach the 50% limit or with respect to the alternative investment vehicle.

IV. Other Damage Issues

■ A. *Oak Class Action Settlement.* One of the common stocks selected by Grace that lost money for the Fund was Oak Industries ("Oak"). Sometime after GCI and Grace were fired, the Fund received a payment of $233,357.54 in connection with the settlement of a class action against the directors and officers of Oak for malfeasance in office. *In re Oak Industries Securities Litigation,* Master File No. 83 0537–G(M) (S.D.Cal.1985). Defendants now argue that the District Court erred in failing to credit this entire sum against the amount of loss calculated by the method outlined above. In crediting only about 28% of this settlement against the loss, they argue, the District Court granted a windfall to the Fund.

This argument fails because it ignores the District Court's correct assumption that the Fund would have received much of this settlement payment even if the defendants had not overinvested in common stocks. Crediting the whole amount of the settlement could be justified only by assuming that the entire settlement was attributable to Oak stock that GCI would have sold if it had complied with the 50% limit. Such an approach effectively ignores the presumption that GCI would have liquidated only a proportionate share of the Oak stock; in that event, much of the settlement represents earnings on Oak shares that the Fund would have owned even if the 50% ceiling had been observed.

■ B. *Preferred Stock.* The original Guidelines attached to the 1981 Agreement between GCI and the Trustees stated that "common stocks" would not exceed 25% of the cost of the securities in the Fund's account. The minutes of the Trustees' meetings, where GCI's requests for increases in the ceiling to 35% and then to 50% were approved and its request for an increase beyond 50% was rejected, use the words "equity investments," "investments in equities," or "equity in stocks" in describing the percentage limit. Appellants acknowledge that preferred stock falls within the category of "equities," but contend that at some point the Trustees agreed that preferred stock would not be counted in applying the 50% limit. In an affidavit and a deposition, Grace represented that the Trustees had approved a separate category for preferred stock within

the overall "equities" that could include up to 7½% of the assets without being counted against the equity investment limit. In their brief appellants contend that the minutes of the meeting approving this "carve-out" provision were never delivered. Though the record is less than clear, it appears that this "carve-out" issue, to the extent that it affected calculation of damages, involves a factual dispute that might not be appropriate for summary judgment.

In its liability opinion, the District Court had held that a "carve-out of preferreds" might reduce the damages owed to the Fund. 664 F.Supp. at 109. In its opinion on damages, however, the Court rejected the "carve-out" because the 50% limit had to be strictly observed. Though that conclusion is correct, as we have held, it does not resolve the dispute as to whether preferred stock should not have been counted in determining, for purposes of damages, the extent to which the 50% limit was exceeded. That dispute might require factfinding, although we cannot be entirely certain because of the lack of clarity in defendants' presentation of this point both here and in the District Court.[3]

Though this dispute is extremely limited, we will vacate the judgment, order a remand, and direct the District Court to afford the defendants an opportunity to make a clear presentation of whatever evidence they have to support their "carve-out" contention. If the District Court concludes that such evidence does not suffice to raise a triable issue as to whether preferred stock should not be counted against the 50% limit for purposes of calculating damages, it may reenter the original judgment; if such a triable issue is presented, the Court should proceed to have this limited factual dispute resolved and make whatever adjustment in damages may be warranted.

## Conclusion

We affirm all of the District Court's rulings as to the liability of GCI and Grace and all of the damages rulings, except the ruling that the preferred stock "carve-out" issue could be resolved on summary judgment.

Affirmed in part, vacated and remanded for limited proceedings consistent with this opinion.

---

**3.** It is not clear, for example, whether appellants contended in the District Court that the 7½% "carve-out" was formally approved by the Trustees or only conditionally approved by a subcommittee of the Trustees in the event the ceiling was increased beyond 50%.